858 F.2d 774
 273 U.S.App.D.C. 179
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
SPECTRON BROADCASTING CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Jarad Broadcasting Company, Inc., Intervenor.
 No. 87-1635.
 United States Court of Appeals, District of Columbia Circuit.
 Sept. 29, 1988.
 
 Before STARR, STEPHEN F. WILLIAMS and SENTELLE, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came on to be heard on the notice of appeal from an order of the Federal Communications Commission, and was argued by counsel. While the issues presented occasion no need for an opinion, they have been accorded full consideration by the Court. See D.C.Cir.R. 14(c). On consideration thereof, it is
 
 
 2
 ORDERED and ADJUDGED, by the Court, that the order of the Federal Communications Commission on appeal herein is hereby affirmed, for the reasons set forth in the accompanying memorandum. It is
 
 
 3
 FURTHER ORDERED, by the Court, sua sponte, that the Clerk shall withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 15 (August 1, 1987). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 This is an appeal from the FCC's grant to Jarad Broadcasting Company of a permit to construct an FM radio station in Garden City, New York. Jarad's principal competitor, Spectron Broadcasting Corp., seeks to overturn the FCC's decision on a variety of grounds. The principal issue, however, is whether the FCC properly applied its long-standing policy with respect to integration of licensee ownership and station management. See Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965).
 
 
 5
 * The FCC chooses among competing license applicants based upon two principal criteria: diversification of mass media control and best practicable service, the criterion at issue in this case. Id. at 394. The FCC evaluates applicants' service primarily upon their quantitative integration credit, an assessment which represents the "full time participation in station operation by owners." Id. at 395. Certain attributes of participating owners--e.g., residence in the community, belonging to a racial minority group, being female, having broadcast experience, and civic leadership--may also lead to awards of qualitive enhancement credit; however, such qualitative assessments can be determinative only when proposals differ insignificantly in quantitative credit. See, e.g., New Continental Broadcasting Co., 88 F.C.C.2d 830 (Review Board 1981), remanded on other grounds, 93 F.C.C.2d 1275 (1983).
 
 
 6
 Partially in recognition of the difficulty of financing a license application and station, the Commission excludes truly passive investors from its integration calculation. Although the Commission usually refers to the applicant's legal structure to determine which owners will control the station (and thus be counted in the integration calculation), the FCC will focus instead on who actually controls the station's day-to-day operation if the record sufficiently indicates that control is inadequately reflected in the formal corporate organization. See KIST Corp., 102 F.C.C.2d 288 (1985), aff'd sub nom. United Am. Telecasters, Inc. v. F.C.C., 801 F.2d 1436 (D.C.Cir.1986) (table), cert. denied, 107 S.Ct. 2181 (1987); Signal Ministries, Inc., 104 F.C.C.2d 1481 (Review Board 1986), aff'd sub nom. Adelphi Broadcasting Corp. v. F.C.C., 838 F.2d 571 (D.C.Cir.1988) (table). It is the Commission's decision to look beyond Spectron's formal corporate structure (and the conclusions the FCC then reached) that is at issue in this case.
 
 II
 
 7
 At the time of the exhibit exchange, Spectron's revised license application set forth a bifurcated capital structure. All voting stock (31 shares) was held by Angela Shaw, an attorney who had previously served on the staff of the FCC (then under the chairmanship of Benjamin Hooks). Initial Decision at 7, p 25, J.A. at 23; Brief for Appellant at 7. The nonvoting stockholders included: Roland Davis, a member of numerous minority and community organizations (owner of 22 of 64 shares of nonvoting stock); Briding Newell, a local resident involved extensively in civic activities (15 shares); Frances Hooks, spouse of the former FCC Chairman and a leader in the black community (5 shares); James Shuart, president of Hofstra University (2 shares); and LuNell Anderson (2 shares). Initial Decision at 8-10, paragraphs 25, 27-31, J.A. at 24-26. To round out the ownership arrangements, Ms. Shaw holds 18 nonvoting shares, in addition to her voting shares. Id. at 7, p 25, J.A. at 23. Shaw, Newell, Anderson, and Hooks are black women, and Davis is also black. Spectron Exhibit 1, at 2, J.A. at 579 (corrected supp.app.). Ms. Shaw proposed to work at the station full time; Mr. Davis, 10-20 hours per week; and Ms. Newell approximately 10 hours per week. Initial Decision at 9-10, paragraphs 28-30, J.A. at 25-26.
 
 
 8
 The Administrative Law Judge accepted this bifurcated corporate structure (and thus Ms. Shaw's sole controlling ownership of Spectron) and awarded Spectron 100 percent full-time integration credit. Id. at 43, p 205, J.A. at 59. Based upon Ms. Shaw's background, the ALJ awarded Spectron 100 percent qualitative enhancement credit for past and future local residence; civic participation; minority ownership; female ownership; and some broadcast experience. Id. Although the ALJ awarded several other applicants (including Jarad) 100 percent full-time integration credit and various enhancement credits, he favored Spectron's application because of its superior qualitative enhancements. Id. at 44, p 206, J.A. at 60.
 
 
 9
 Faced with various exceptions to the Initial Decision, the Review Board diminished Spectron's integration credit and awarded the license to Jarad, the runner-up in the Initial Decision. Decision, 1 F.C.C. Rcd at 185, 190, paragraphs 21, 53, J.A. at 65, 70. The Review Board based its integration calculation upon actual control of the station as shown in the record, rather than the formal division of voting from nonvoting stock. In particular, the Review Board relied upon the undisputed testimony that two of the nonvoting stockholders (Mr. Davis and Ms. Newell) would devote significant time to directing the station's operation and policies. Id. at 184, p 18, J.A. at 64. Specifically, under Spectron's proposed organization, Mr. Davis and Ms. Newell would join Ms. Shaw in serving on the station's board of directors, with each person having one vote. In addition, both would "be active in managing the station on a daily basis through their participation on three policy-making committees." Id. at 185, p 21, J.A. at 65. The Review Board focused in part upon Mr. Davis's promise to devote 10-20 hours per week, and Ms. Newell's to devote approximately 10 hours per week, to management and policy-making functions. Id. at 184, p 18, J.A. at 64.
 
 
 10
 Although the Review Board considered the foregoing involvement a "sufficient" basis for reducing the integration credit, id., Ms. Shaw's testimony about the nature of her application and extent of control over the company was seen by the Board as buttressing its finding that she would not in fact wield exclusive control. Id. at 183-84, paragraphs 14-16, J.A. at 63-64. The eleventh-hour creation of a separate class of stock, the lack of independent business reason to separate voting from nonvoting stock, and the participation of nonvoting members in the development of the application, the Board reasoned, further confirmed its conclusion that Ms. Shaw did not sufficiently retain sole control over Spectron and that the Board should therefore disregard Spectron's formal corporate structure. Id. at 184, paragraphs 16-17, J.A. at 64.
 
 
 11
 Based on these findings, the Review Board held that Spectron's formal corporate structure did not reflect "where true ownership and control rests." Id. at 185, p 21, J.A. at 65. Having found that nonvoting stockholders would participate significantly in Spectron's management and control, the Board concluded that the applicant was not entitled to the 100 percent integration credit based upon Ms. Shaw's sole control and proposed full-time work. The Board declined to decide whether Spectron was entitled to full-time integration credit reflecting only Ms. Shaw's equity holdings (52 percent) or to no credit at all (the amount which would be due an unreliable proposal), but simply concluded that "Spectron is not entitled to credit approaching the 100 percent awarded to other applicants, and is, in essence, eliminated from further comparative contention." Id. The Review Board later denied motions for reconsideration of its Decision. Jarad Broadcasting Co., 1 F.C.C. Rcd at 1267.
 
 
 12
 Upon application for review, the Commission upheld the Review Board's disposition. Jarad Broadcasting Co., 2 F.C.C. Rcd at 6080-81, paragraphs 2, 10, J.A. at 76, 78. The Commission directed that the Review Board's Decision be modified to omit one comment about Spectron's behavior and one basis for disregarding the applicant's formal legal structure in awarding integration credit. Id. at 6080-81, paragraphs 2-3, J.A. at 76-77. The FCC deemed both of these mistakes harmless error. Id.
 
 III
 
 13
 On the principal issue, we are satisfied that the FCC correctly applied its well-settled policies with respect to integration. On this record, the Commission could reasonably conclude that two nonvoting shareholders (Newell and Davis) would in fact share with Ms. Shaw significant responsibility in the actual management and operation of the proposed station. In particular, the Commission justifiably relied on the findings that both Ms. Newell and Mr. Davis would, first, each spend at least 10 hours per week involved in station affairs; second, serve on committees with significant responsibilities for shaping basic station policies and operation; and, third, actively participate in management affairs as members of the three-person board of directors. See Decision, 1 F.C.C. Rcd at 184-85, paragraphs 18, 21, J.A. at 64-65. The Commission's additional stated grounds for its decision further justify its disposition. See id. at 183-84, paragraphs 14-17, J.A. at 63-64.
 
 
 14
 In view of these findings, prior cases fully support the Commission's holding. The Commission's integration policy calls for the FCC to disregard truly passive investors who exercise no significant control over the applicant. See Anax Broadcasting, Inc., 87 F.C.C.2d 483 (1981); Bradley, Hand, and Triplett, 89 F.C.C.2d 657 (Review Board 1982). The Commission also looks beyond the applicant's formal corporate structure to determine actual control of the applicant when circumstances warrant. See KIST Corp., 102 F.C.C.2d at 290-93; Signal Ministries, Inc., 104 F.C.C.2d at 1494-97. The Commission "will not hesitate to discredit the integration proposals of applicants where [it is] presented with convincing evidence that limited partners or non-voting shareholders are or will be in fact exercising influence or control over the ongoing business." Victory Media, Inc., 3 F.C.C. Rcd 2073, 2074-75 (1988).
 
 
 15
 We can find no relevant distinction between the Commission's action or reasoning in this case and its reasoning and disposition in Signal Ministries, 104 F.C.C.2d at 1481, and cases relied on in that decision. In Signal Ministries, the nonvoting stockholders had, among other things, significantly participated in discussions of corporate affairs and planned to assume prominent policy-setting and day-to-day management roles at the station. Id. at 1495. The Review Board disregarded the formal corporate structure and extended its integration analysis beyond voting shareholders because "the participation, both past and proposed, of the non-voting shareholders is so thoroughly intertwined with the participation of the voting stockholders." Id. at 1496. Based upon a proposed corporate structure which was at odds with the participation of nominally nonvoting shareholders, the Board in Signal Ministries reduced the integration credit at least by half. Id. at 1497. The Board also restricted the integration calculation to those shareholders proposed for credit before the "B" cutoff date. Id. at 1496-97.
 
 
 16
 Spectron argues that the Commission's action here is quite different from that in Signal Ministries and is indeed inconsistent with two other Commission decisions, namely Birmingham Family Television, Inc., 91 F.C.C.2d 348 (Review Board 1982), and Greater Wichita Telecasting, Inc., 90 F.C.C.2d 1046 (Review Board 1982), modified, 96 F.C.C.2d 984 (1984). Not so. Birmingham Family and Greater Wichita may bear upon whether equity owners who are involved in management less than full time might be entitled to residual integration credit, but neither case undermines the Commission's quantitative integration calculation, which is the dispositive issue in this case. Indeed, both cases are fully consistent with that disposition. Birmingham Family did deem local residence of eight (out of fifteen) directors worthy of "slight credit" of " 'minor significance.' " 91 F.C.C.2d at 353 (quoting Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d at 396). But as to our case, any minority enhancement awarded by virtue of Ms. Newell's and Mr. Davis's involvement, by analogy, would not affect the disposition of this case; indeed, the analogy buttresses the Commission's treatment of the dispositive issue to the extent it supports the conclusion that Ms. Newell and Mr. Davis were essentially participating owners. Birmingham Family also recognized that directors who (like Mr. Davis and Ms. Newell) would devote 10-20 hours per week on station work were not entitled to full-time or even part-time integration credit "because [they] will each spend insufficient time on station affairs." Id. (citing Midwest Broadcasting Co., 70 F.C.C.2d 1489, 1495 (Review Board 1979)).
 
 
 17
 Greater Wichita likewise provides no support for Spectron's position. Although appellant suggests that the Commission's denial of credit for involvement of passive investors in Greater Wichita conflicts with the Commission's actions in this case, Reply Brief for Appellant at 14-15, that is just not so. Because in Greater Wichita the formal corporate structure was not belied by who actually controlled the applicant and did not shield a contested integration proposal (indeed, the decision awarded no integration credit), the decision merely restates the general rule that truly passive investors are not included in the integration calculation. That is, because the legal structure assured no integration credit which the limited partners' management activities (which were far less than those of Ms. Newell and Mr. Davis) might undermine or call into question, Greater Wichita does not suggest that those management activities by nominally passive investors cannot invalidate a corporate structure that does not reflect actual control.[1]
 
 
 18
 In sum, we can discern in the Commission's disposition no agency infidelity to precedent or unreasoned application of policy to the facts of the case. Cf. Greater Boston Television Corp. v. FCC, 444 F.2d 841 (D.C.Cir.1970), cert. denied, 403 U.S. 923 (1971).
 
 IV
 
 19
 In addition to its principal attack, Spectron also contests the FCC's failure to reconsider various attacks upon Jarad's application; charges that the Commission's hostility to Ms. Shaw impermissibly motivated its decision; and alleges deprivation of Spectron's investors' due process rights.
 
 
 20
 Spectron seeks to revive several challenges to the Commission's grant of a permit to Jarad. However, Spectron did not appeal the Review Board's rejection of these challenges to the Commission. See Application for Review of Spectron Broadcasting Corp. for Review of Review Board's Decision (Nov. 17, 1986), J.A. at 465-75. Because the Commission has not considered these issues, they are not properly before us. See 47 U.S.C. Sec. 405; Rogers Radio Communications Serv. v. FCC, 751 F.2d 408, 413 n. 14 (D.C.Cir.1985).
 
 
 21
 Spectron also argues that the Commission's impermissible hostility to Ms. Shaw led to denial of the application. First, Spectron alleges that the Commission applied an improperly high standard in evaluating Ms. Shaw's testimony and application because she had previously been an FCC attorney. We disagree. The passing reference to Ms. Shaw's former service, Decision, 1 F.C.C. Rcd at 183, p 15, J.A. at 63, appears amidst a long discussion of how Ms. Shaw appeared to be unfamiliar with the application, especially with the details that supposedly established her sole control of Spectron for integration purposes. That reference undermines neither the Commission's conclusions as to the extent of Ms. Shaw's control nor the independent basis for its decision, namely the participation of nominally nonvoting shareholders in station affairs.
 
 
 22
 Second, Spectron alleges that the FCC denied its application because it was motivated by hostility to Ms. Shaw's membership in a racial minority group and to Spectron's claims to minority enhancement credits. There is no evidence whatever of this; despite its serious charges, Spectron has offered not a shred of evidence of improper motivation underlying Commission policies or treatment of Spectron. Indeed, the gist of Spectron's grievance appears to be that the FCC did not respond to the minority membership of many of Spectron's shareholders by subordinating its well-established integration rules to the concerns that underlie the minority enhancement credit. But there is simply no ground in law to warrant our tearing asunder the Commission's long-standing policy with respect to integration of ownership and management.
 
 
 23
 Finally, Spectron broadly alleges a host of violations of various constitutional rights. The burden of this argument seems to be that by disregarding Spectron's proffered corporate structure, the FCC ran roughshod over various constitutional rights of individuals associated with Spectron. These contentions are entirely without merit. The FCC grounded its conclusions on the sworn testimony of Spectron shareholders themselves; that is, Ms. Newell and Mr. Davis testified that they would carry out significant Spectron management duties and decisions affecting the licensee. By crediting this testimony, the FCC obviously worked no due process or equal protection violation. To suggest the contrary is frivolous. Nor do the Commission's policies in any manner chill associational liberties of those interested and concerned about Spectron. Indeed, it is abundantly clear that Spectron could have structured its affairs either to include those involved in the day-to-day management of the station in its integration and enhancement calculations, or to limit passive investors to non-management roles and functions.
 
 V
 
 24
 Prior to oral argument and more than six weeks following appellant's filing of the joint appendix, Jarad filed a "Motion to Strike and to Correct Portions of the Joint Appendix." That motion also requested the court to order sanctions against Ms. Shaw and (or) Spectron. Jarad contended that appellant had failed to include certain material that Jarad and the FCC had designated for inclusion in the joint appendix and had submitted versions of other designated Jarad exhibits that grossly deviated from the exhibits filed with the Commission.
 
 
 25
 By order dated August 29, 1988, we granted Jarad's motion to strike and directed the filing of the corrected joint appendix, which was in fact completed. In addition, Ms. Shaw filed two affidavits, one from Ms. Regina Robinson, a sometimes employee of Spectron, and the other from Ms. Shaw herself.[2] The affidavits' burden was that Ms. Shaw had directed (and then relied upon) Ms. Robinson to secure the pertinent materials for inclusion in the original joint appendix. The affidavits indicate that when the errors in the joint appendix were brought to Ms. Shaw's attention, her schedule, including extensive travel commitments, led her to rely once again upon the efforts of Ms. Robinson to correct the appendix. In the following weeks, no corrections were made, until Jarad's motion and this court's order finally prompted the filing of a corrected joint appendix.
 
 
 26
 We do not lightly countenance an attorney's failure to comply with the requirements of Rule 30, F.R.A.P. The integrity of the appellate process depends upon the accuracy and completeness of the appendix, and, as this case illustrates, judicial economy requires that agreements among parties regarding materials to be included in the appendix be fulfilled. In our view, Ms. Shaw's discharge of her duties imposed by Rule 30 fell below acceptable standards. We are nonetheless unprepared to conclude, on the record before us, that sanctions should be imposed. We do, however, admonish counsel for what appears clearly to have been a cavalier attitude toward her responsibilities as an officer of the court.
 
 
 
 [1]
 Appellant apparently also employs the Review Board's decision in Greater Wichita to argue that the activities of noncontrolling shareholders should entitle the applicant to residual integration credit. Brief for Appellant at 28. However, the Commission reversed that determination, denying any such credit. See Greater Wichita Telecasting, Inc., 96 F.C.C.2d at 989
 Additionally, in view of its integration calculation in this case, the FCC had no need to consider granting (much less actually to grant) any such enhancement credit. Because the Commission's quantitative integration calculation rendered Spectron's application vastly inferior to other applications, any slight enhancement credit, or even marginal integration credit, that Spectron may have deserved was simply irrelevant to the outcome of this case. In fact, Newell and Davis's activities entitled Spectron to no additional credit, because the bar upon changes in integration applications existed, see Signal Ministries, Inc., 104 F.C.C.2d at 1496; because they would devote insufficient hours per week to station affairs, see Midwest Broadcasting Co., 70 F.C.C.2d at 1495; and because, if actually passive investors, they were not to be included in the integration calculation at all, see Anax Broadcasting, Inc., 87 F.C.C.2d at 488.
 
 
 [2]
 Ms. Shaw, Spectron's principal, has been the counsel of record in this proceeding. However, Spectron was represented by outside counsel before the Commission in various FCC proceedings